IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| HOST AMERICA CORPORATION, a Connecticut corporation, and GLOBALNET ENERGY INVESTORS, INC., a Texas corporation,<br><br>    Plaintiffs,<br><br>vs.<br><br>COASTLINE FINANCIAL, INC., an Arizona corporation,<br><br>    Defendant. | **ORDER AND MEMORANDUM DECISION**<br><br>Civil No. 2-04-CV-879<br>Judge Tena Campbell |

      This lawsuit was filed to determine the rightful owner of certain goods. Coastline Financial Inc. seized the goods in question when foreclosing on a lessor's lien against its tenant K.W.M. Electronics. Host America Corp., which had an ongoing business relationship with K.W.M. Electronics, claimed that it was the rightful owner of the seized goods and requested a preliminary injunction allowing it to take possession of those goods. The court granted Host America's request, but required Host America to deposit a bond in the amount of $150,000.

      After a bench trial, the court concluded that Coastline was the rightful owner of the goods and was entitled to recover for any damage caused by Host America taking possession of the goods. (See Findings of Fact & Conclusions of Law & Memo. Decision 9.) This matter is now before the court for a determination of the amount of damages Coastline is entitled to recover.

1

**Analysis**

There are essentially two types of goods at issue here: ENS boards and FanSavers. ENS boards are electronic boards used in energy management or energy saving devices. FanSavers are energy saving devices installed in refrigerators. Host America took possession of both the the ENS boards and FanSavers under the authority granted by the preliminary injunction. But the court has now determined that Coastline was the rightful owner of the ENS boards and FanSavers. Therefore, it is necessary to determine the amount of damages Coastline is entitled to recover from Host America for being deprived of the goods.

"The fundamental principle of damages is to restore the injured party, as nearly as possible, to the position he would have been in had it not been for the wrong of the other party." United States v. Hatahley, 257 F.2d 920, 923 (10th Cir. 1958). "The general rule is that damages awarded for personal property that is taken or destroyed are based on the item's value at the time of the taking or destruction." Winters v. Charles Anthony, Inc., 586 P.2d 453, 454 (Utah 1978). Typically, the market value of the property is used as an indicator of the damage occasioned by the loss of the property. See id. "[M]arket value is defined as the price for which an article is bought and sold and for which there exists a demand in the market place, and the legal definition of that price is retail, not wholesale." Id. But if no market exits, damages may be calculated by assessing the actual value of the property, or, if it is a unique item, the value to the owner. See id. "The rule is a flexible one that can be modified in the interest of fairness." Id.

As a preliminary matter, Host America argues that Coastline has not established that it was sincerely interested in selling the goods. According to Host America, Coastline took no action to sell the goods during the time it controlled the ENS boards and FanSavers. In fact, Host America points out that Robert Geoffrey Hoag, the principle owner of Coastline, testified that Coastline has made no attempts to sell any of the electronic equipment seized as part of the foreclosure. See Bench Trial Transcript, Dec. 12, 2005, ("12/12/05 Tr.") 137-39.) Host America contends that Coastline's inaction is evidence that Coastline never intended to sell the goods at all. (See Plf.'s Momo. on the Issue of Damages 6 ("Coastline had no interest in obtaining and realizing value from the goods; it simply wanted to piggy-back the amount of Host America's acquisition price to establish a measure of damages.").)

The court is satisfied by the record evidence that Coastline intended to sell the ENS boards and FanSavers and would have made such an attempt if time had permitted. The court notes that Coastline actively opposed Host America's efforts to gain possession of the goods. That opposition indicates that Coastline believed that the goods retained value in its possession. Second, Mr. Hoag testified that Coastline was interested in selling the goods, but that Coastline simply did not have enough time to do so  Mr. Hoag testified that Coastline had possession of the goods for only "a very short period of time" before Host America sought injunctive relief. (Id. at 138.) Mr. Hoag's testimony indicates that Coastline would have attempted to sell the goods if time had permitted. (Id.) The court finds his testimony convincing.

But the conclusion that Coastline would have attempted to sell the goods had they remained in its possession far from ends the pertinent inquiry. To resolve the present issue, the court must determine whether a market existed for the ENS boards and FanSavers. If so, then the court must determine the fair market value of those goods. However, if, as Host America contends, there was no market for the goods, then the court must determine the actual value of the ENS boards and FanSavers.

### The Market for the Goods

Although the market value of lost or destroyed property is considered the touchstone of any attempt to determine the damages awardable to the injured party, "market value does not apply to every fact situation, where, for example, the property is peculiar or unique, is not an object of commerce, and has no market value." King v. United States, 292 F. Supp. 767, 775 (D. Colo. 1968).

Host America contends that the ENS boards and FanSavers have no market value because the ENS boards were not finished goods, and the FanSavers required further assembly and were unmarketable by any entity other Host America. (See Plf.'s Memo. on the Issue of Damages 3.) For example, Charlie Stevenson, an employee and eventual owner of K.W.M. Electronics, testified that the ENS boards would have had only scrap value if Host America decided to no longer pursue the product. (12/12/05 Tr. at 48.) Additionally, two former K.W.M. employees testified that the ENS boards were "specialized" goods and that no one would be interested in

4

purchasing the boards other than Host America.  (See id. at 111; Bench Trial Transcript, Dec. 13, 2005, ("12/13/05 Tr.") 20-22.)

Coastline responds that Host America itself would be a potential purchaser of the goods and argues that Host America, by pursuing legal relief, was essentially forcing a sale of the goods with the bond required by the court serving as a down payment.  (See Def.'s Memo. in Support of Award of Damages 6.)  Additionally, Mr. Hoag testified that he had experience with another company that made a product "that does the same identical thing that E.N.S. Globalnet boards do."  (12/12/05 Tr. at 135.)  According to Mr. Hoag's testimony, he "could have sold [the ENS boards] easy."  (Id. at 138.)  Mr. Hoag stated that he had the capability to complete any remaining work that the boards required and mentioned several possible purchasers.  (Id. at 138-139.)  The court is satisfied that a market existed for the ENS boards.  Certainly, Host America was interested in acquiring the ENS boards and the testimony of Mr. Hoag supports the conclusion that even if Host America no longer desired the boards, Coastline would have been able to sell the boards to another purchaser.

Similarly, the court is not persuaded by Host America's argument that the FanSavers were unmarketable.  Trial testimony established that the FanSaver parts essentially retained the same character after Host America purchased those parts.  Charlie Stevenson, an officer of Host America, testified that the FanSavers "would require some redesign work."  (Id. at 44.)  But Mr. Stevenson also testified that no work was ever completed on the FanSavers beyond verifying the receipt of the component parts and creating a plan for future manufacturing.  (Id. at 44-45.)  As a

result, at the time Host America took possession of the FanSavers under the authority of the preliminary injunction, the FanSavers were essentially the identical parts that Host America originally purchased from Advanced Refrigeration. Whatever new market or new product that Host America was planning to develop never came to fruition and therefore the goods to which Coastline was entitled when foreclosing on its lessor's lien were the unimproved FanSavers originally purchased on the open market by Host America.

Given the above, the court concludes that a market existed for both the ENS boards and the FanSavers at the time Host America took possession of those goods. As a result, Coastline is entitled to receive the market value of those goods.

The Value of the Goods

*1. The ENS boards*

Coastline argues that the ENS boards have a value of $250,000. In support of its contention, Coastline cites the Verified Complaint filed by Host America, which states that "[t]he retail value of the [ENS boards] is in an amount no less than $250,000." (Verified Compl. ¶ 27.) Additionally, Coastline points out that Mr. Stevenson and Geoffrey Ramsey testified during the preliminary injunction hearing that value the ENS boards was $250,000. Mr. Stevenson also represented in a sworn statement that the ENS boards were worth $250,000. (See Ex. D, Aff. of Charlie Stevenson, ¶ 4 ("[A] payment for the [ENS boards] in full of $250,000 was delivered to K.W.M.").)

Throughout these proceedings, Host America contended that it paid K.W.M. Electronics $250,000 in relation to the ENS boards. Host America even submitted an invoice indicating that K.W.M. Electronics valued the ENS boards at $223,600. (See Verified Compl., Ex. A.) The court previously concluded that although Host America did make $250,000 in payments to K.W.M. Electronics, those payments were in the nature of a loan as well as advanced payment for necessary development of the FanSavers. (Findings of Fact & Conclusions of Law & Memo. Decision 4-5.) Further, the court concluded that the invoice allegedly setting the value of the ENS boards was not authentic. (Id. at 6.)

Nevertheless, Coastline argues that Host America's repeated assertions that the ENS Boards were worth $250,000 should serve as evidence of the boards' value. The court agrees and concludes that Host America accurately and fairly represented the retail value of the ENS boards at $250,000. Even if Host America's valuation statements were not binding judicial admissions,[1] the court concludes that those statements may serve as evidence of the amount of damages to which Coastline is entitled. Cf. First Bank of Marietta v. Hogge, 161 F.3d 506, 510 (8th Cir. 1998) (statements made by a party in an abandoned pleading may be weighed as evidence by the court). Further, the court notes that "a tortfeasor should bear the burden of uncertainty in the amount of a tort victim's damages[.] . . . [O]nce the fact of damage is

---

[1] "Judicial admissions are formal, deliberate declarations which a party or his attorney makes in a judicial proceeding for the purpose of dispensing with proof of formal matters or of facts about which there is no real dispute. U.S. Energy Corp. v. Nukem, Inc., 400 F.3d 822, 833 n.4 (10th Cir. 2005) (internal quotation omitted).

established, a defendant should not escape liability because the amount of damage cannot be proved with precision." Robinson v. All-Star Delivery, Inc., 992 P.2d 969, 972 (Utah 1999).

There is competent evidence in the record that supports the conclusion that the ENS boards carried a retail value of $250,000. Although Host America argues that the value of the boards changed depending on the party that possessed them, the court has previously noted that the testimony on that point is in conflict. Having already determined that Coastline would have been able to take advantage of an existing market for the ENS boards, the court now concludes that the market value of the boards remained the same after Coastline gained possession of them. Accordingly, Host America is obligated to provide Coastline with $250,000 in damages for wrongfully taking possession of the ENS boards.

2. The FanSavers

Coastline relies upon the testimony of Mr. Ramsey, Host America's CEO, in its attempt to establish a value for the FanSavers. Mr. Ramsey testified that Host America paid $45,445 for the FanSavers. An invoice received into evidence supports Mr. Ramsey's testimony and establishes that Host America paid Advanced Refrigeration $45,455.40 for the FanSavers. (Ex. V.)

"The cost of an article may or may not be the market value at the time of purchase; an article may be purchased for sentimental reasons, or other reasons may enter into a purchase price contract that produces a variance from the market value of articles having a market value." Haycraft v. Adams, 24 P.2d 1110, 1112 (Utah 1933). As discussed, K.W.M. Electronics made

no material changes to the parts Host America acquired from Advanced Refrigeration. No significant amount of time or use of the goods intervened between the time Host America purchased the FanSavers and the point at which they took possession of the FanSavers under the authority of the preliminary injunction. As a result, the court determines that the purchase price of the FanSavers is sufficient evidence of the value of the FanSavers. Accordingly, Coastline is entitled to $45,445.40 in damages for the loss of the FanSavers.

## Conclusion

The court concludes that Coastline is entitled to $250,000 in damages stemming from the loss of the ENS Boards to Host America. Additionally, Coastline is entitled to $45,445.40 in damages occasioned by the loss of the FanSavers. Therefore, judgment is entered in favor of Coastline in the total amount of $295,445.40.

SO ORDERED this 11th day of April, 2006.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
United States District Judge